City of Pittsburgh, Appellant *v.* J. Pivirotto, Appellee.

Argued October 10, 1985, before Judges CRAIG and and PALLADINO, and Senior Judge KALISH, sitting as a panel of three.

*John George Shorall, II,* Assistant City Solicitor, with him, *D. R. Pellegrini,* City Solicitor, for appellant.

*Stephen Israel,* with him, *Marianna E. Specter,* for appellee.

Opinion by Judge Craig, December 19, 1985:

The City of Pittsburgh appeals from an order of the Court of Common Pleas of Allegheny County which held the city liable for demolishing a house without providing notice to the appellee, James Pivirotto, who had purchased the house fourteen months earlier, at a city treasurer's sale of the premises on account of real estate tax delinquency.

As a general proposition, a municipality must, before destroying a building, give an owner sufficient notice, a hearing and ample opportunity to demolish the building himself or to do what suffices to make it safe and healthful for use and occupancy. 7 E. McQuillin, Municipal Corporations §24.561 (3d rev. ed. 1981). *See City of Pittsburgh v. Kronzek,* 2 Pa. Commonwealth Ct. 660, 280 A.2d 488 (1971).

In the Commonwealth, both state law and local ordinance address the notice procedure.

The Fire Prevention Law for Cities of the Second Class requires that when the city issues a condemnation order, the city must serve the owner by "pasting a copy or copies in a conspicuous place on the building referred to in such order, and by prepaid mailing of a copy thereof, on the same day to the owner or owners." Section 3 of the Act of May 13, 1915, P.L. 297, 53 P.S. §25094.

The Building Title of the Pittsburgh Code of Ordinances directs:

The Supervisor shall prepare a notice of condemnation describing the unsafe conditions which have caused the building or structure to become an unsafe or otherwise dangerous building and [order] the abatement of such condi-

tions. . . . Such notice of condemnation shall be signed by the Superintendent and shall be sent to the owner or the owner's agent by certified registered mail or served personally on such owner or agent.

Pittsburgh Code §1007.18(a).[1]

Because neither the statute nor the ordinance defines the term "owner," this appeal raises two related questions:

(1) At what point does the purchaser of property at a treasurer's tax sale become the 'owner' entitled to notice from the city that the property has been condemned and will be demolished?

(2) Has the city's condemnation office, in attempting to ascertain the property owner for the purpose of sending notice of condemnation, satisfied due process by making its final title search on the day before bids for demolition are solicited, which here was twenty-two days before demolition began?

The need to resolve these questions[2] arises because of the intersecting functions of two city agencies. In brief, the history is as follows:

---

[1] When the city first discovers a code violation, but before condemnation, the code provides: "Whenever any building, structure or part thereof or appurtenance thereof is found to be an unsafe building, the Superintendent shall give written notice to the owner, lessee, tenant, occupant and/or agent, describing the unsafe condition and ordering the abatement thereof within the period specified in the notice." Pittsburgh Code §1007.16(b) (1979).

[2] Our scope of review is limited to determining whether constitutional rights have been violated or whether the trial court abused its discretion or committed an error of law. *Board of Pensions and Retirement of City of Philadelphia v. Einhorn*, 77 Pa. Commonwealth Ct. 228, 230, 465 A.2d 139, 140 (1983).

Sept. 8, 1976: Code enforcement officers of the Bureau of Building Inspection cited the dwelling at 5741 Pierce Street for building code violations, and mailed notice to then record owners, Motan and Warburton.

Sept. 12, 1977: Appellee Pivirotto purchased the property at the city treasurer's sale.[3]

May 18, 1978: The condemnation office of the Bureau of Building Inspection inspected the property, cited it for code violations, posted a condemnation notice[4] on the front door, and mailed a notice only to the record owners, Motan and Warburton.

---

[3] The Law in effect in 1977 provided:

In addition to the remedies now provided by law for the collection of delinquent city taxes, the city treasurers of cities of the second class of this Commonwealth are hereby authorized and empowered to sell at public sale, in the manner hereinafter provided, property upon which the taxes, assessed and levied have not been paid and have become delinquent.

Section 3 of the Act of July 6, 1947, P.L. 1258, *formerly* 53 P.S. §26101, repealed by section 604(a) of the Second Class City Treasurer's Sale and Collection Act, Act of October 11, 1984, P.L. 876, 53 P.S. §27604.

[4] The Bureau of Building Inspection's Notice of Condemnation listed the following violations:

Mortar deteriorated in foundation
Joists out of level
Studding out of plumb
Mortar deteriorated in chimney
Soffit and facia [sic] rotted
Siding rotted, broken
Glass in windows broken out
Doors broken
Gutter rotted
Downspouts rusted, leaking
Porch rotted, out of level
Floors and stairs weak, worn
Plaster cracked, loose

Oct. 2-4, 1978: The condemnation office performed a primary inspection on the property, ascertaining that since the posting for condemnation, no work had been performed to remedy the unsafe condition. The condemnation office then sent a "courtesy letter" to the same record owners, stating that bids will be solicited for demolition of the property because of continuing unremedied violations.[5]

Oct. 26, 1978: The condemnation office solicited bids for demolition, and awarded a contract to a private contractor.

Oct. 27, 1978: The city treasurer issued the deed to the appellee purchaser, and its acknowledgment was entered and recorded in the Treasurer's Deed Book of the Allegheny County Prothonotary.

Nov. 18, 1978: The contractor began the house razing.

March 15, 1979: The contractor completed the razing.

Because of the statutory redemption period,[6] which was one year when Mr. Pivirotto bid on the property

---

Building open, vandalized, littered with debris unfit and unsafe for occupancy, constituting a serious hazard in the immediate area and a danger to the general welfare of the public.

[5] The city may order the owner or occupant of any building to alter, repair, or remove any building or structure to safeguard life or property, and if the owner or occupant fails to obey such order, the city may have the necessary work done at its own expense, and then later recover those costs from the owner or occupant. Section 1(b) of the Act of May 13, 1915, P.L. 297, 53 P.S. §25082.

[6] The lands sold under this act may be redeemed by the owner or by any one interested in said lands, at any time within one year after such sale, by the payment to the city treasurer of the full amount which the purchaser paid to said treasurer for taxes and costs and ten per centum in addition thereto . . . .

Section 3 of the Act of July 5, 1947, P.L. 1258, *formerly* 53 P.S. §26103, repealed by Section 304 of the Second Class City Treasurer's Sale and Collection Act, 53 P.S. §27304 (owner may redeem within ninety days after date of treasurer's sale).

in 1977, the city treasurer did not issue Mr. Pivirotto's deed to the property until October 27, 1978. As of that date, the prothonotary entered acknowledgment of that deed in Treasurer's Deed Book Volume 13, page 179, in the prothonotary's office. *See* section 7 of the Act of July 5, 1947, P.L. 1258, *formerly* 53 P.S. §26107, repealed by section 604(a) of the Second Class City Treasurer's Sale and Collection Act, Act of October 11, 1984, P.L. 876, 53 P.S. §27604. A similar provision is now found in section 307 of the Second Class City Treasurer's Sale and Collection Act, 53 P.S. §27307.

The city conducted its final search of the record one day before the solicitation of demolition bids, which took place on October 26, 1978. That search therefore still identified Motan and Warburton as the owners of record.

Hence, the city never sent notice to Mr. Pivirotto, even though the deed to him became a matter of record in the prothonotary's office more than twenty days before demolition began.

On November 18, 1978, a neighbor to the property, who knew that Mr. Pivirotto had purchased the property, telephoned Mr. Pivirotto to inform him that a crew was demolishing the house.

We turn to the Real Estate Tax Sale Law[7] for guidance as to who is the "owner" for the purposes of determining whom must be provided with notice. That Law defines "owner" as

the person in whose name the property is last registered, if registered according to law, and in all other cases ['owner'] means any person in open, peaceable and notorious possession of the property, as apparent owner or owners thereof, or the reputed owner or owners thereof,

---

[7] Act of July 7, 1947, P.L. 1368, *as amended*, 72 P.S. §§5860.101-5860.803.

in the neighborhood of such property; as to property having been turned over to the bureau by any county, 'owner' shall mean the county.

Section 102 of the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, *as amended,* 72 P.S. §5860.102.

Purchaser Pivirotto addresses the question of ownership in terms of title to the property and suggests that, at the time the treasurer's hammer falls at the tax sale, the purchaser acquires such equitable title that he should be considered an equitable owner entitled to notice of condemnation. *Robinson v. Williams,* 6 Watts. 281 (1837) ("the title of a purchaser at a tax sale runs from the date of the sale").

The city suggests that, because property purchased at a treasurer's tax sale is subject to a one-year period of redemption, the purchaser, until the redemption period expires, receives merely a right of title and cannot be considered an owner entitled to receive notice from the city.

Hence, we first address the title interest acquired by the purchaser at a tax sale.

In *Olshefskie v. Budock,* 41 D. & C. 373 (1941), the court held that the purchaser of property sold by the county treasurer for delinquent taxes has no right to possession of the premises until after the expiration of the redemption period. Consistent with this rule, the court reasoned that, until the period of redemption expires, the original owner retains a right to do any act affecting the freehold, and accordingly, that the purchaser is precluded from doing any act affecting the freehold during that period.

In reaching its decision, the court relied upon *Gault's Appeal,* 33 Pa. 93 (1859), stating:

[The purchaser] is not invested with any title to the land whatever, because the owner's title is not divested: If the owner's title be not di-

vested, the incidents of title remain, one of which is, in the absence of actual possession, to draw the possession to the title, and to enable the owner, upon his constructive possession, to maintain trespass. This exists up to the last moment before [the period of redemption has expired]. Up to that time he would not be a trespasser by entering on the land and cutting timber, or doing any other act affecting the freehold. This is by reason of title.

*Olshefskie,* 41 D. & C. at 377 (1941) (citations omitted). *See also City of Scranton v. O'Malley Manufacturing Co.,* 341 Pa. 200, 205, 19 A.2d 269, 271 (1941) ("the title of the purchaser at such a sale is not perfected by the mere sale but is complete only when the return is made and the deed is delivered."); *Woodland Oil Co. v. Shoup,* 107 Pa. 293 (1884).

The purpose of notice of condemnation and demolition orders is to provide the property owner with the opportunity for a hearing in which to litigate the question of whether the property is actually a danger to public safety, and to provide the property owner with a reasonable time in which to make repairs in order to eliminate the dangerous condition.[8] Applying *Olshefskie,* the conclusion must be that the purchaser at a tax sale has no right to notice where he cannot claim that the city is affecting his property right. Accordingly, until the period of redemption has expired, a purchaser of land at a delinquent tax sale has no right to notice of proceedings against the property.

Furthermore, the city contends that notice mailed to the record owners at the time of condemnation fully satisfied the city's obligation to provide notice to the "owner," regardless of the appearance of another

---

[8] *See Keystone Commercial Properties, Inc. v. City of Pittsburgh,* 464 Pa. 607, 613-14, 347 A.2d 707, 710 (1975).

owner before demolition. However, the prothonotary had entered a record of Mr. Pivirotto's deed in the treasurer's deed book in the prothonotary's office on October 27, 1978, and demolition on the property did not begin until November 18, 1978, twenty-two days thereafter.

Therefore, we next address the question of whether the city's practice of making its final title search to ascertain the record owner *at the time that bids for demolition are solicited* satisfies the requirements of due process when the actual demolition does not take place until three weeks later.

In *Curtis Building Co., Inc. v. Tunstall,* 36 Pa. Commonwealth Ct. 233, 236, 387 A.2d 1370, 1371-72 (1978), we stated, "[t]he notice required by due process is that which is reasonably calculated, under all of the circumstances, to actually apprise interested parties and afford them an opportunity to present their objections." *(Citing Mullane v. Central Hanover Bank and Trust Co., 339* U.S. 306, 314 (1950).)

Clearly, once the period of redemption expires and the purchaser's deed is made a matter of record, the purchaser becomes the "owner," entitling him to notice of the proceedings which the city is taking against his property. However, the city's practice of making its final title search at the time it solicits demolition bids creates a potentially indefinite[9] period during which condemned property could change hands, so that the demolition of the property can occur without a new owner ever having had the opportunity to dispute the

---

[9] Although inspectors from the condemnation office make periodic inspections of the demolition site, the private demolition contractor hired by the city primarily determines the demolition schedule. Here the trial court noted that demolition began on November 18, 1978. The condemnation inspector also photographed the site, to establish that the work was completed on March 15, 1979.

city's finding of condemnation or to correct the cited defects.

That unfortunate result occurred here. The city treasurer recorded Mr. Pivirotto's deed to the property one day after the city made its final title search of the property.

A sound application of the law does not require that the city make a daily, or even weekly, search of the record to ascertain whether ownership of condemned properties has changed. All that is necessary is a single title search shortly before demolition begins, so that the city can then give notice to the owner on an up-to-date basis.

The trial court correctly relied upon *Friedman v. City of Los Angeles*, 52 Cal. App. 3d 317, 125 Cal. Rptr. 93 (1975). There the defendant city condemned a fire-damaged building, and notified the record owners that the city would demolish the building if repairs were not made. Six months thereafter, the plaintiff purchased the building and recorded his deed. However, five more months passed before the city demolished the building without first redetermining the identity of the record owner.

The court held that the city had violated the plaintiff's due process rights, stating, "[t]he City's plodding demolition procedures provide no excuse for its failure to make a timely title search, and the City cannot reasonably rely on former property owners to give notice of prospective demolition to present owners on the City's behalf."

Therefore we conclude that the city's determination of when it would finally check ownership was not reasonably calculated, under all of the circumstances, to apprise interested parties of the city's plans to demolish condemned properties.

Accordingly, we affirm the conclusion of the trial court.

We next address Mr. Pivirotto's right to recover delay damages.

Pa. R.C.P. No. 238 provides that in an action for bodily injury, death or property damage, a successful plaintiff shall be awarded damages for delay at 10% per annum computed from the date the plaintiff filed the initial complaint in the action, or from a date one year after the accrual of the cause of action, whichever is later, up to the date of the decision. The court must award damages where, before decision, the defendant made no offer to settle or made an offer of less than 125% of the amount which the plaintiff was ultimately awarded.

In *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 436 A.2d 147 (1981), *appeal dismissed sub nom. Bucheit v. Laudenberger*, 456 U.S. 940 (1982), the Supreme Court stated that, although Pa. R.C.P. No. 238 serves to compensate the plaintiff for the inability to utilize funds rightfully due him, its primary aim is to encourage settlement, thus alleviating congestion in the courts.

The city cites section 333 of the Act of Oct. 5, 1980, P.L. 693 (found in the preamble to Chapter 85, subchapter C of the Political Subdivisions Tort Claims Act, 42 Pa. C. S.), which relates to actions against local parties and states that, in actions against local agencies, "no interest shall accrue in any such action prior to any entry of judgment."

The city contends that that passage precludes Mr. Pivirotto from recovering delay damages against the City of Pittsburgh. In resolving this question, we must consider whether the legislature intended that delay damages be recoverable against local agencies and whether the legislature equates delay damages with interest.

Pa. R.C.P. No. 238(a)(1) states that damages for delay "shall become part of the award, verdict or decision." Hence, as that language indicates, the legislature intended to make delay damages an actual component of the plaintiff's entitlement, as distinguished from interest on the award. In *Laudenberger*, the Supreme Court stated:

> Although the award for delay of time may be 'in the nature of interest,' in reality, it is merely an extension of the compensatory damages necessary to make a plaintiff whole. Damages have been defined as 'the sum of money which the law awards or imposes as pecuniary compensation, recompense, or satisfaction for an injury done or a wrong sustained as a consequence either of a breach of a contractual obligation or a tortious act.'

496 Pa. at 66, 436 A.2d at 154-55 *(citing* 22 Am. Jur. 2d, Damages §1).

Dictum in *Commonwealth v. Twentier,* 76 Pa. Commonwealth Ct. 537, 541, 464 A.2d 642, 644 (1983), suggested that section 101 of the Political Subdivisions Tort Claims Act[10] purported to prohibit delay damages from being assessed against local government entities, but that suggestion was based on the prohibition against pre-judgment interest. As *Laudenberger* has indicated, 496 Pa. at 66, 436 A.2d at 154-55, the Supreme Court has indicated that delay damages are a substantive part of the plaintiff's recovery and cannot be equated with interest.

Additionally, Pa. R.C.P. No. 238(g) specifically excludes the award of delay damages in (1) eminent domain proceedings and (2) pending actions in which

[10] Act of November 26, 1978, *formerly* 53 P.S. §5311.101, repealed by section 333 of the Act of October 5, 1980, P.L. 693. A similar provision is now found in 42 Pa. C. S. §8541.

damages for delay are allowable in the absence of this rule. Had the legislature intended local governments to be immune from the assessment of delay damages, we can expect that it would have expressly stated that intention.

Accordingly, we conclude that the cited preamble does not preclude the plaintiffs from recovering delay damages against the City of Pittsburgh and therefore affirm the award of the trial court.

### ORDER

Now, December 19, 1985, the order of the Court of Common Pleas of Allegheny County, No. G.D. 80-14421, dated June 28, 1983, is affirmed.