MARSHA J. BLANCHARD, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY A. REARDON, DECEASED, APPELLANT, V. CITY OF RALSTON, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLEE.

549 N.W.2d 652

Filed May 28, 1996.   No. A-94-1142.

Mandy L. Strigenz, of E. Terry Sibbernsen, P.C., for appellant.

Eugene P. Welch and Francie C. Riedmann, of Gross & Welch, P.C., for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and MUES, Judges.

Mues, Judge.

Marsha J. Blanchard appeals the decision of the district court for Douglas County which denied her claim for damages under the theory of inverse condemnation against the City of Ralston.

## STATEMENT OF FACTS

On August 11, 1987, Mary A. Reardon, the owner of a house located at 4903 South 77th Avenue in Ralston, Nebraska, passed away. Reardon's husband had predeceased her, and the couple had one child, Marsha J. Blanchard. Blanchard, who was named personal representative of Reardon's estate, was to receive the house under Reardon's last will and testament. In February 1988, Blanchard, who was separated from her husband, moved into the house with her four children. In June 1990, the children went to live with their father in Valley, Nebraska. Blanchard remained in the house until October 1990, when she left to join her husband and children in Valley.

Due to Blanchard's financial difficulties, the electricity in the house had been shut off in the spring of 1990. At the time Blanchard moved out of the house in October, she had received a final notice that the water in her house would also be shut off. Blanchard and her husband returned to the house periodically during the fall of 1990. Blanchard's husband returned to the house in December after Blanchard was contacted by the Ralston Police Department concerning complaints about animal noises at the house. These complaints were responded to and resolved.

*City's Investigation and Actions.*

The events salient to this appeal began on February 28, 1991, when Ralston police Lt. William White received a complaint that a hissing sound was coming from the house. In his investigation of the house, Lieutenant White discovered a water leak in the basement and standing water in the basement area. Upon entering the house, Lieutenant White found mold covering the walls and carpet, dirty dishes in the kitchen, and old furniture and other items thrown in disarray. In Lieutenant White's opinion, the house was a " 'health nuisance.' " Lieutenant White's report indicated that the house was "[c]urrently titled to REARDON, MARY A. and is in probate at this time."

The information regarding the house was relayed to Mayor Julie Haney of Ralston. On March 8, 1991, Mayor Haney sent a letter to the Douglas County Health Department requesting someone to assist the Ralston building inspector on an inspection of the house. Mayor Haney also contacted the city building inspector, Boyd and Associates, and an appraisal firm, Hyatt and Associates. On April 25, the acting building inspector, William Churchill; Lieutenant White; and a Douglas County health inspector, Obert Lund, entered the house to make an inspection.

In a letter to Mayor Haney dated April 30, 1991, Lund noted that the house was full of moisture, with mold and mildew covering the ceilings and walls. In addition, Lund stated the carpets were covered with feces, fungi, and garbage. Lund also found that there was a strong odor inside the house which permeated into the surrounding neighborhood. In the letter, Lund expressed his opinion that "[t]his structure constitutes a public health hazard and action must be taken as soon as possible to abate the problem."

At trial, Lund testified that he was concerned that the house was not secured because the front door was broken. Lund also testified that he was worried that the increase in temperature which was expected in the upcoming months would produce additional growth in the fungi. Indeed, Lund had again inspected the house on May 16, 1991, and found that conditions had further deteriorated. Lund testified at trial that the house posed possible health hazards such as E. coli bacteria in the feces, viruses in the water such as Legionnaires' disease, and airborne spores that could be breathed into the lungs or picked up through the skin. However, before the city council on May 16, Lund stated that the condition of the house could result in "various type illnesses which, since I'm not a doctor, I'm not qualified to go into that area, but generally speaking, we are talking about spores and bacteria and viruses that if ingested into the lungs could make people ill."

Churchill, the building inspector, testified at trial that 50 percent of the walls were covered with mold, the upstairs carpeting was "squishy," and there was standing water in the basement. Churchill also testified that it was his opinion that the

south and west walls in the basement were at the point of failure. The south wall had cracks running across it that were at some points more than half an inch wide, and the wall itself had moved inward 3 or 4 inches. The joists were saturated with moisture and were white with fungus, and Churchill did not believe that they were structurally sound. In a letter to Mayor Haney dated April 26, 1991, Churchill concluded that the building was unsafe as defined by Ralston Mun. Code § 9-401 and further opined that it should be demolished and removed pursuant to Ralston Mun. Code § 9-405.

Mayor Haney also inspected the house sometime in April 1991. Based on what she saw, the reports of Churchill and Lund, her concerns for the neighbors, and the fact that the weather was warming up, Mayor Haney determined that an emergency situation existed and that the house should be demolished. Mayor Haney testified at trial that she came to this conclusion sometime after April 26, 1991. On May 1, Ralston City Attorney Patrick Heng informed Mayor Haney that he had given permission to a neighbor to remove a birdbath from the property so that it would not be " 'bulldozed.' " A Ralston City Council meeting was held on May 7 at which the procedure for the demolition of the house was discussed. The procedure consisted of (1) posting notice on the house, (2) waiting 3 days, and (3) demolishing the house. Heng then prepared a notice that was posted at the premises on May 8. The notice stated:

TO: OWNER, OCCUPANT OR INTERESTED PARTIES OF THESE PREMISES

You are hereby notified that this house has been determined to be an unsafe building and a nuisance after inspection by the Ralston Police Department. The causes for this decision are the odor and health hazard present in this house.

You must remedy this condition or demolish the building within three (3) days from the date of posting of this Notice or the Municipality will proceed to do so. Appeal of this determination may be made to the Governing Body, acting as the Board of Appeals, by filing with the Municipal Clerk within ten (10) days from the date of posting of this Notice a request for a hearing.

*Notice to Blanchard.*

Blanchard was not served personally with the above notice. Moreover, she had not been contacted in February 1991 when the water leak was first discovered. Blanchard testified that the first contact she received concerning the house after the December 1990 animal complaint was when Lieutenant White called her husband's place of work and left a message to call "Connie" at city hall. Blanchard testified at trial: "I'm not sure about the exact date. It would have been late March, early April, sometime [in] that time span." However, evidence contained in a summary of events compiled by a city official indicates that the call was made on April 25, 1991, and Lieutenant White confirmed in his deposition that he contacted Blanchard's husband on that date.

The evidence shows that Blanchard phoned city hall on April 29, 1991, and spoke with Connie Kompare, the administrative assistant to the mayor. Blanchard testified that Kompare told her that there had been some water damage to the house and that there was going to be a "meeting" to discuss condemning the house. Blanchard stated that Kompare did not inform her of when the meeting would be held. Further, Blanchard testified that she provided Kompare with her address at that time. Kompare told Blanchard that Blanchard would need to contact the city attorney, Heng, for more information. Other evidence indicates that Kompare told Blanchard during that conversation that the house was in the process of condemnation and would be demolished, that Blanchard provided Kompare with a mobile phone number, and that this number was then provided to Heng.

Despite several attempts to reach Heng by phone, Blanchard does not recall ever making contact with Heng. However, Heng testified that Blanchard had phoned him sometime prior to the posting of the notice on May 8, 1991. Heng estimated the date of the call to have been 2 to 3 weeks before the house was demolished. Heng testified that in this conversation Blanchard told him where she was living, but Heng did not recall writing down her address. During this conversation, Blanchard informed Heng that she had an interest in the house. It is undisputed that except for the May 8 posted notice no further

attempt was made by the city to contact Blanchard after that conversation.

Regarding general efforts to notify the owner of the house, Heng testified that attempts were made to determine who the owner was so that proper notice could be given. Heng had received the report of Lieutenant White which indicated that the house was "[c]urrently titled to REARDON, MARY A. and is in probate at this time." A title search on the property disclosed that title was held by the Land Reutilization Authority of Douglas County, which had obtained the property through a foreclosure proceeding. Heng's attempts to determine if the property was indeed in probate consisted of sending a colleague to check potential probate filings regarding Reardon's estate. When this occurred is not clear. The colleague reported to Heng that nothing was found "under [Reardon's] name" which would indicate that such a file was opened. Apparently, no follow up occurred. The record shows, however, that the city filed a sewer use and garbage removal lien on the subject property on March 13, 1991, directed to "Marsha Blanchard, personal representative of the estate of Mary Reardon." While Heng testified that he realized by May 8 what Blanchard's relationship to the property was, Blanchard was not provided with written notice of the condemnation and demolition because Heng did not have her address. Such notice was, however, provided to the Land Reutilization Authority as well as the county assessor's office.

Blanchard was informed on May 12, 1991, of the city's formal action to demolish the house when personal friends Richard Medina and Carolyn Harrington from Ralston drove to Valley to tell her that a notice had been posted on the door. On May 13, Blanchard and Medina entered the house in order to retrieve some personal property and at that time removed only one box of personal papers from the front closet. Medina also testified that he went back to the house the following day to clean it up after receiving permission from the city. However, Medina was stopped by the Ralston police from removing any trash from the premises because the contents of the house, along with the house, were then owned by "Douglas County."

*Hearing and Demolition.*

On May 14, 1991, Blanchard contacted an attorney, Carl Klekers. On May 15, Klekers prepared and Blanchard and Medina filed a notice of appeal and request for hearing on the condemnation of the house. A hearing was set for May 16 at noon. The house was scheduled to be demolished at 1 p.m. The scheduled time for the demolition had previously been set by Mayor Haney.

At the May 16, 1991, hearing, Barry Boyd, the acting building inspector, testified concerning the condition of the house. Boyd had inspected the house that morning. Lund testified about the health conditions described above. In addition, Kompare, from the mayor's office, testified that the house had been appraised at $55,000, that the land was valued at $15,000, and that the cost of repair was approximately $31,500. Several citizens of Ralston testified about their concerns regarding the house. Medina testified, on behalf of Blanchard, that he was willing to attempt to repair the house and that he felt the cost of repair would be approximately $20,000. Medina requested a 2-week delay to enable him to go into the house and clean it out and make further inspection of what was needed to repair the house. Blanchard did not testify. The city council denied Medina's request and further voted to declare an emergency situation and to deny Blanchard's appeal.

Mayor Haney testified that following the hearing, a contract was signed with a demolition crew to destroy the house. However, Darrell Fager, who was contracted with to demolish the house, testified that it was his recollection that he had received a signed contract sometime in the late morning of May 16, 1991. Although the city's summary of events indicates that the demolition began at 1:15 p.m., Klekers testified that on May 16, at approximately 10 a.m., he drove past the house and observed a wrecking crew already removing the driveway. In addition, the city's summary shows that at 8:30 a.m. a trenching service was removing the water service to the house at the city's direction. Immediately following the hearing, Klekers again drove by the house and observed that the crew had already demolished the garage and the connecting vestibule from the garage to the house and had started on the house itself. The

city's summary shows that the house was demolished by 2:45 p.m.

*Blanchard's Lawsuit.*

On April 6, 1993, Blanchard filed a petition in the district court for Douglas County. Blanchard alleged that the actions of the city constituted a taking entitling her to damages under the theory of inverse condemnation pursuant to Neb. Rev. Stat. § 76-701 et seq. (Reissue 1990) and Neb. Const. art. I, § 21. In addition, Blanchard alleged that the city's actions were in violation of Ralston Mun. Code §§ 9-401 through 9-406 in that Blanchard was not given proper notice or a reasonable time in which to repair. As a result of the taking, Blanchard alleged that she was damaged in the sum of $70,000.

A trial on the matter was held on March 28, 29, and 30 and May 17, 1994. In an order dated July 8, 1994, the district court found that due to the condition of the house "an immediate danger i.e. an emergency, existed." While the court found that the notice afforded Blanchard was "less than perfect," it found that Blanchard received actual notice in March or April 1991. The court further determined that the city had the authority pursuant to its police power to order the removal of a dangerous building which had become a nuisance, without payment of compensation or acquiring the property through eminent domain. The court then dismissed Blanchard's petition. Blanchard timely appeals from this decision.

## ASSIGNMENTS OF ERROR

On appeal, Blanchard alleges that the district court erred by (1) finding that an emergency condition existed with regard to her house sufficient to deprive her of due process, (2) finding that Blanchard was afforded due process, and (3) not compensating Blanchard for the value of her property.

## STANDARD OF REVIEW

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly erroneous. *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996); *Lee Sapp*

*Leasing v. Catholic Archbishop of Omaha*, 248 Neb. 829, 540 N.W.2d 101 (1995).

■ However, when reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Lee Sapp Leasing, supra; Eggers v. Rittscher*, 247 Neb. 648, 529 N.W.2d 741 (1995); *Dolan v. Svitak*, 247 Neb. 410, 527 N.W.2d 621 (1995).

## ANALYSIS

In her petition, Blanchard alleges a theory of recovery for inverse condemnation pursuant to § 76-701 et seq. and Neb. Const. art. I, § 21. Section 76-705 provides:

> If any condemner shall have taken or damaged property for public use without instituting condemnation proceedings, the condemnee, in addition to any other available remedy, may file a petition with the county judge of the county where the property or some part thereof is situated to have the damages ascertained and determined.

In addition, article I, § 21, states that "[t]he property of no person shall be taken or damaged for public use without just compensation therefor." In *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 684, 515 N.W.2d 401, 405 (1994), inverse condemnation was described as "a shorthand description for a landowner suit to recover just compensation for a governmental taking of the landowner's property without the benefit of condemnation proceedings."

There is no dispute in this case that the city demolished the house without instituting condemnation proceedings and without compensation. However, the city argues, as the trial court found, that this situation is nevertheless *not* a taking entitling Blanchard to compensation. The city maintains that it had the authority pursuant to its police power to remove a dangerous building which constituted a nuisance. While Blanchard does not seem to contest the fact that the city had this power, Blanchard asserts that the city did not properly exercise the power because it failed to provide her adequate due process. The city counters by arguing that because an emergency existed in this situation, the city was not required to afford Blanchard

any due process in connection with the removal of the building, and if any due process was required, it was given. The issue in this case is therefore whether the city properly exercised its police power in the destruction of Blanchard's house.

The Nebraska Supreme Court has recognized the authority of a city of a metropolitan class to remove or order the removal of a dangerous building which has become a nuisance because of its condition. See, e.g., *Hroch v. City of Omaha*, 226 Neb. 589, 413 N.W.2d 287 (1987); *Goldsberry v. City of Omaha*, 181 Neb. 823, 151 N.W.2d 329 (1967). Although Ralston is not a city of the metropolitan class, Neb. Rev. Stat. § 18–1720 (Reissue 1991) also provides that all cities and villages have the power "by ordinance to define, regulate, suppress and prevent nuisances, and to declare what shall constitute a nuisance, and to abate and remove the same." Ralston provides such definitions and procedures in Ralston Mun. Code § 9–401 et seq.

Furthermore, courts generally hold that a city is not liable for a taking if it destroys or damages private property while *properly* exercising its police power in abating a nuisance or public health hazard. See, *City of Minot v. Freelander*, 426 N.W.2d 556 (N.D. 1988) (homeowner was not entitled to compensation under Fifth Amendment when house was demolished to abate public and private nuisance); *Powell v. City of Clearwater*, 389 N.W.2d 206 (Minn. App. 1986) (city had power to destroy building without paying damages after owner failed to correct hazardous conditions on premises); *Starzenski v. City of Elkhart*, 659 N.E.2d 1132 (Ind. App. 1996) (owner not entitled to compensation for items destroyed by city when city removed excessive trash and debris from home to abate nuisance); *Brown v. State*, 21 Cal. App. 4th 1500, 26 Cal. Rptr. 2d 687 (1993) (state's actions in cleaning up hazardous waste were legitimate exercise of police power and did not constitute inverse condemnation).

■ However, in order for a city to *properly* exercise its police power in the destruction of a nuisance so as to avoid liability for taking an owner's property, the city must first provide the owner with sufficient due process. See, *Inman v Town of New*

*Hartford,* 116 A.D.2d 998, 498 N.Y.S.2d 618 (1986); *City of Pittsburgh v. Pivirotto,* 93 Pa. Commw. 563, 502 A.2d 747 (1985), *aff'd* 515 Pa. 246, 528 A.2d 125 (1987); 7A Eugene McQuillan, The Law of Municipal Corporations § 24.561 (3d rev. ed. 1989). Sufficient due process in this situation was addressed in *City of Pittsburgh v. Pivirotto,* 93 Pa. Commw. at 564, 502 A.2d at 748, where the court stated that "[a]s a general proposition, a municipality must, before destroying a building, give an owner sufficient notice, a hearing and ample opportunity to demolish the building himself or to do what suffices to make it safe and healthful for use and occupancy." Citing 7 Eugene McQuillan, The Law of Municipal Corporations § 24.561 (3d rev. ed. 1981), and *Pittsburgh v. Kronzek,* 2 Pa. Commw. 660, 280 A.2d 488 (1971). Moreover, Neb. Rev. Stat. § 18-1722 (Reissue 1991) provides in part:

> If any owner of any building or structure fails, neglects, or refuses to comply with *notice by or on behalf of any city or village to repair, rehabilitate, or demolish and remove a building or structure which is an unsafe building or structure and a public nuisance,* the city or village may proceed with the work specified in the notice to the property owner.

(Emphasis supplied.)

Also, Ralston Mun. Code § 9-403 provides in part:

> Whenever the building inspector, the fire official, the health official, or the Governing Body shall be of the opinion that any building or structure in the Municipality is an unsafe building, he shall file a written statement to this effect with the Municipal Clerk. The Clerk shall thereupon cause the property to be posted accordingly, and shall file a copy of such determination in the office of the County Register of Deeds, and shall *serve written notice upon the owner thereof,* and upon the occupant thereof, if any, by certified mail or by personal service. Such notice shall state that the building has been declared to be in an unsafe condition; and that such dangerous condition must be removed or remedied by repairing or altering the building or by demolishing it; and that the condition must

be remedied within sixty (60) days from the date of receipt.

(Emphasis supplied.)

Notwithstanding the general proposition that a city must give an owner sufficient notice, an opportunity to be heard, and an opportunity to repair or demolish in order to properly exercise its police power in the destruction of a nuisance, courts have recognized situations where the city can summarily destroy property without liability for a taking. See, e.g., *Turpen v. City of St. Francisville*, 145 Ill. App. 3d 891, 495 N.E.2d 1351 (1986); *City of Chicago v. Garrett*, 136 Ill. App. 3d 529, 483 N.E.2d 409 (1985); *Leppo v. City of Petaluma*, 20 Cal. App. 3d 711, 97 Cal. Rptr. 840 (1971). In those situations where courts have allowed a city to summarily destroy nuisances without compensating the owner, the courts have generally found that an "emergency" exists such that the process due is not as encompassing as that necessary in the absence of such "emergency."

For example, in *Leppo v. City of Petaluma*, the city notified the owners of its finding that their building was unsafe due to widening cracks in the walls. The city also informed the owners of its intention to demolish the building and gave the owners a certain amount of time in which to destroy the building themselves. The city, however, did not give the owners a hearing on the question of immediate need for demolition. The court nevertheless found that if the city could establish by a preponderance of the evidence that an emergency actually existed, the city could dispense with a due process hearing and demolish the building summarily. Also, in *Turpen v. City of St. Francisville*, the court found that because the building in question was leaning toward the sidewalk, threatening to fall into the street, and was in a weakened condition, there existed such an emergency that the city was not required to adhere strictly to the notice requirements of the municipal code.

The Ralston Municipal Code provides for this specific situation in § 9–405, which provides:

UNSAFE BUILDINGS; EMERGENCY. Where any unsafe building or structure poses an immediate danger to the health, safety, or general welfare of any person or

persons, *and the owner fails to remedy the situation in a reasonable time after notice by the Building Inspector to do so*, the Municipality may summarily repair or demolish and remove such building or structure.

(Emphasis supplied.)

We must therefore determine whether Blanchard was afforded the appropriate due process under the circumstances presented here. This determination to a certain extent depends on whether the trial court was clearly erroneous in its factual finding that an emergency existed in this situation. If no emergency existed, then Blanchard was entitled under the Ralston Municipal Code to be served with written notice of the condition of the house and given 60 days in which to repair or demolish the house. It is clear from the record, and the city does not dispute, that Blanchard was not provided with written notice or 60 days in which to repair or demolish the house. It is the city's assertion, however, that because of the condition of the house, an emergency existed, and therefore no process was due or the due process afforded was adequate.

The trial court found in its order that there was no question that an "immediate danger i.e. an emergency" existed. Based on the circumstances of this situation, however, we are not so readily inclined to reach such a conclusion. While no one appears to dispute that this house was in a deplorable condition, the actions of the city call into question its claim of necessity for immediate action.

The record indicates that the city knew in late February 1991 that this house had experienced a water leak and that the Ralston Police Department had designated it as a " 'health nuisance.' " However, despite the fact that the city placed a lien against the property in the name of "Marsha Blanchard" in March, the city made no attempt to contact Blanchard until the end of April. In addition, the building inspector and health inspector did not inspect the house until April 25, even though Mayor Haney had sent a letter requesting the health inspector's assistance on March 8. According to Mayor Haney, she then declared the house an "emergency" sometime after April 26. In fact, the evidence reveals that on May 1, Heng told the mayor that he had let a neighbor remove a birdbath from the premises so that it

would not get " 'bulldozed.' " The city nevertheless did not take further action until May 7 when the "emergency" situation was discussed at a city council meeting. Then on May 8, a notice was posted on the house which, interestingly, gave the owner only 3 days to remedy the problem, but 10 days to appeal the decision to demolish.

The city's delayed action after becoming aware of the situation and even after declaring the situation to be an "emergency" calls into question its claim of "immediate danger." However, under our standard of review we cannot overturn a factual finding of the lower court unless it is clearly erroneous. Because there is evidence to support the court's finding that an immediate danger existed, we do not find that it is clearly erroneous.

■ However, even assuming a danger of some immediacy, there remains the question of whether Blanchard was afforded procedural due process under the circumstances. The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process presents a question of law. *Billups v. Nebraska Dept. of Corr. Servs. Appeals Bd.*, 238 Neb. 39, 469 N.W.2d 120 (1991); *Jordan v. Ben. Rev. Bd. of U.S. Dept. of Labor*, 876 F.2d 1455 (11th Cir. 1989). With questions of law, this court is required to reach a conclusion independent of the lower court's ruling. *Lee Sapp Leasing v. Catholic Archbishop of Omaha*, 248 Neb. 829, 540 N.W.2d 101 (1995); *Eggers v. Rittscher*, 247 Neb. 648, 529 N.W.2d 741 (1995); *Dolan v. Svitak*, 247 Neb. 410, 527 N.W.2d 621 (1995).

As the trial court noted, the notice given Blanchard was "less than perfect." Although the trial court found that Blanchard had actual notice of problems with the house in March or April 1991, the evidence indicates that Blanchard was in fact first contacted on April 25, and then only by a phone message left at her husband's place of employment. The city then decided on May 7 to demolish the house. Notice was then posted on the house on May 8, giving the owner 3 days in which to repair or demolish the house before the city demolished the house and 10 days in which to appeal the decision to demolish it. This notice was not, however, served on Blanchard by certified mail or

personal service. Even though the evidence shows that by early May, Heng knew of Blanchard's interest in the property, knew the approximate area in which she was living (although he had failed to write down her address), and had the ability to contact her through her husband's cellular phone, no attempt was made to contact Blanchard regarding the demolition.

The city, relying on *Hroch v. City of Omaha*, 226 Neb. 589, 413 N.W.2d 287 (1987), asserts that Blanchard was nonetheless afforded the requisite due process because she was given notice and an opportunity to be heard. *Hroch* provides:

> " ' "The due process clause does not guarantee to a citizen of a State any particular form or method of state procedure. Its requirements are satisfied if he has reasonable notice, and reasonable opportunity to be heard and to present his claim or defence, due regard being had to the nature of the proceedings and the character of the rights which may be affected by it." . . .' "

*Id.* at 591, 413 N.W.2d at 288, quoting *Webber v. City of Scottsbluff*, 155 Neb. 48, 50 N.W.2d 533 (1951).

In addition, in *Howard v. City of Lincoln*, 243 Neb. 5, 12, 497 N.W.2d 53, 58 (1993), the Nebraska Supreme Court held that when there has been a deprivation of a significant property interest, due process requires notice and an opportunity to be heard that is " ' "appropriate to the nature of the case." ' " Quoting *Boddie v. Connecticut*, 401 U.S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971). However, in *In re Interest of L.V.*, 240 Neb. 404, 413, 482 N.W.2d 250, 257 (1992), the court also stated:

> Since due process is applicable and adaptable to various situations and, therefore, necessarily and inherently flexible, adaptability and flexibility of due process should not be mistaken for, or equated with, an absence of minimal procedural protection against a governmental attempt to restrict or eliminate personal rights guaranteed by the Constitutions.

It is the city's position that although no notice was mailed to Blanchard as required by Ralston Mun. Code § 9–403, Blanchard nevertheless had actual knowledge of the city's intention to demolish the house by May 12, 1991, when Medina

and Harrington informed her that a notice had been posted on the house. Moreover, the city asserts that Blanchard then also had the opportunity to be heard at a hearing before the city council. The city maintains that this notice and hearing were reasonable and adequate for this situation.

Indeed, Blanchard was given the opportunity to appear before the city council and dispute the fact that the house was an unsafe building which posed an emergency situation. However, the evidence shows that Blanchard was not given notice which was reasonably calculated to inform her about the issues involved in the proceeding and thus was necessarily denied a reasonable opportunity to refute or defend against all of the charges and accusations. The record indicates that not until the hearing on May 16, 1991, 1 hour before demolition was set to begin, was Blanchard informed about the overall condition of her home, including what specific health hazards the house posed or what structural problems existed. Prior to that, Blanchard was only informed that the house had been determined to be a nuisance and an unsafe building due to "odor and health hazard." Without being provided the necessary information concerning the issues involved in the condemnation of the house, Blanchard had no opportunity to refute or defend against the accusations, or to present evidence that she could reasonably cure the defects.

Furthermore, due process in this situation requires notice, an opportunity to be heard, and an opportunity to repair or demolish the building. See, e.g., *Inman v Town of New Hartford*, 116 A.D.2d 998, 498 N.Y.S.2d 618 (1986); *City of Pittsburgh v. Pivirotto*, 93 Pa. Commw. 563, 502 A.2d 747 (1985), *aff'd* 515 Pa. 246, 528 A.2d 125 (1987); 7A Eugene McQuillan, The Law of Municipal Corporations § 24.561 (3d rev. ed. 1989). While Blanchard was given some notice and an opportunity to appear before the council, she was only given notice of the demolition 4 days before it was to take place, and then she was not properly notified of what needed to be repaired.

As previously stated, § 9–405 of the Ralston Municipal Code provides that the city can summarily repair or demolish a building if "the owner fails to remedy the situation in a

*reasonable time* after notice by the Building Inspector to do so." (Emphasis supplied.) Although the condition of the house was not such as to entitle Blanchard to a full 60 days in which to remedy the situation under Ralston Mun. Code § 9-403, the time afforded Blanchard in which to remedy the situation was not reasonable under the circumstances.

Even though we cannot conclude that the lower court's finding of an "immediate danger" was clearly erroneous, we nonetheless find as a matter of law that the process afforded Blanchard in this situation was less than that which she was due. The facts of this case show that while an "immediate danger" was found to exist, the city waited approximately 3 weeks before taking action to abate the danger. Furthermore, the city was less than diligent in its search for Blanchard, despite the city council and mayor's concerns for providing the proper notice to anyone with an interest. Even when the city did locate Blanchard, it made no real efforts to inform Blanchard of its decision to demolish the house and did not provide her with the necessary information to attempt to abate the problems. The city's understandable frustration at the neglect of the property does not excuse it from its due process obligations. We find that the situation was not such as to justify denying Blanchard minimal procedural protections beyond those which she was afforded here.

Under these circumstances, we find as a matter of law that Blanchard was not afforded due process. Therefore, the use of police power was not proper, the city's actions constitute a taking for purposes of inverse condemnation, and Blanchard is entitled to a determination of damages. As one commentator noted:

> While the right exists in the exercise of the police power to destroy property which is a menace to public health or safety, public necessity is the limit of the right and the property cannot be destroyed if the conditions which make it a menace can be abated in any other recognized way. Destruction of property is a drastic remedy, and it must necessarily be a remedy of last resort.

7A McQuillan, *supra*, § 24.561 at 183.

## CONCLUSION

Because the city did not afford Blanchard adequate due process, the city's actions in summarily destroying the property were not proper under its police power, and as a result a taking occurred for purposes of inverse condemnation. We therefore reverse the judgment and remand the cause to the district court to determine damages.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.