THE CITY OF CHICAGO, Plaintiff and Counterdefendant-Appellee, v. H. E. GARRETT *et al.*, Trustees, Defendants and Counterplaintiffs-Appellants.

First District (2nd Division)   No. 84—2112

Opinion filed September 3, 1985.

Bianco & Szygowski, of Chicago (Peter Bianco, Jr., of counsel), for appellants.

James D. Montgomery, Corporation Counsel, of Chicago (Philip L. Bronstein and Julie Elena Brown, Assistant Corporation Counsel, and Judith Grant, law student, of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Following demolition of defendant's building, plaintiff filed this action for a demolition decree and lien in regard to the subject premises for payment of fees associated with the demolition. Defendant counterclaimed, asserting that plaintiff had demolished the property without notice or court order. After trial, the court entered judgment against defendant for payment of fees incurred by plaintiff in removing the debris associated with the demolition and entered a lien against the subject property for that amount. It is from that judgment that defendant appeals.

On January 29, 1979, H. E. Garrett and W. T. Vandergriff (defendant) were the owners of property located at the southeast corner of Diversey and Sheffield in Chicago. The property, a one-story vacant brick structure, measured 125 feet by 125 feet by 18 feet and was designed and used as an automobile dealership and showroom. The structure had a wooden bow string truss roof that sat on masonry bearing walls 18 feet in height; the roof consisted of six trusses running in a north-south direction bearing directly on the walls.

There is no dispute that an unusually large snowfall took place beginning on January 28, 1979, and ending in the early hours of

January 29, 1979. The snowstorm resulted in snow two to four feet deep throughout the city. As a result of this heavy snow, a portion of the roof and walls of defendant's building, supported by the two eastern-most trusses collapsed in the morning hours of January 29. This initial collapse affected most of the southeast portion of the structure, but left standing, in that corner, a 40-foot tall chimney.

The Chicago Transit Authority (CTA) elevated tracks run directly adjacent to and parallel with the east side of defendant's building. After the initial collapse, the chimney stood alone and rose approximately 25 feet above the elevated tracks.

Following the initial collapse, city demolition inspectors arrived and examined the premises. A wrecking company was called and ordered to remove the dangerous portions of the building and to put the building in a safe condition. As the wrecking crew was in the process of so doing, a second collapse occurred. It was defendant's contention that the actions of the wrecker resulted in the second collapse. Plaintiff maintained that the initial collapse resulted in an enormous strain on the remaining trusses that, when combined with the weight of the snow, caused the second collapse. After the second collapse, the plaintiff maintained that the building had lost its structural integrity and was in an imminent state of collapse. Consequently, pursuant to section 41.9 of the Chicago Municipal Code, the city undertook summary demolition procedures and leveled the building.

At trial, plaintiff's expert testified that, in his opinion, the building was no longer safe after the first collapse because of the lack of lateral support. In regards to the second collapse, he stated that the western-most truss collapsed because of a crack in it that resulted from the first collapse and from the weight of the snow; it did not collapse because of the actions of the wrecking crew in removing dangerous portions of the building.

Defendant's expert stated that, in his opinion, the building was structurally safe after the first collapse. He stated that the north wall did not appear to be buckling, that the ceiling was in good shape, that the south wall was not bulging, that the chimney was not dependant on the side walls for support, and that the crack in the western-most truss did not cause the second collapse. He opined that the building could have been safely shored up. The testimony of both experts was based upon photographs taken on the scene after the first collapse.

Prior to closing arguments, defendant filed a motion for a mistrial, which he later withdrew. Defendant renewed the motion and

requested a new trial upon completion of the bench trial. Defendant argued that the trial court, outside of the courtroom and out of the presence of either attorney, had consulted with an architect named William Friend. The judge admitted discussing the case with Friend, and on Friend's suggestion, read material on the question of lateral supports. Defendant maintained that the information obtained by the judge formed the basis of questions posed by the judge to defendant's expert. When the motion was argued by defendant, the judge specifically stated that the information he obtained from outside the courtroom had no bearing on his decision in favor of plaintiff and that his decision was based only upon evidence in the record.

The court concluded its findings by discounting the testimony of both experts because neither had been present and because there were a number of eyewitnesses. The court then signed the findings prepared by plaintiff and denied the motion for a mistrial or new trial.

■ The first issue for review is whether the trial court improperly obtained and considered expert evidence outside of the proceedings. Defendant maintains that the trial judge committed reversible error by consulting with an architect on the question of lateral support, outside of the courtroom and presence of either attorney, by reviewing books not in evidence recommended by the architect and by questioning his expert on information the judge had thus obtained. Plaintiff argues initially that defendant waived any error by withdrawing with prejudice its motion for a mistrial and, alternatively, that any error was harmless in the absence of clear prejudice to defendant.

On the question of waiver, subsequent to the order withdrawing defendant's motion for a mistrial, defendant renewed his objection in a written motion, after trial, requesting either a mistrial or new trial based on the alleged error. Under these circumstances, this court finds no waiver.

It is fundamental that the purpose of requiring an objection at trial and the renewal of that objection after trial is to afford the trial court an opportunity to correct any perceived error thereby ensuring a fair trial. The colloquy between defendant's counsel and the trial judge on the original motion for a mistrial, before the trial was over, clearly demonstrated that the trial judge was aware of defendant's objection and fully considered the merits of that point. Defendant's counsel withdrew its motion on the court's assurance of an impartial decision based only upon the evidence introduced at trial. After a decision against him, defendant's renewal of that objection

in a written motion for a new trial has effectively given the trial judge a second chance to consider the alleged error and has preserved it for review on appeal. *Cf. Williams v. Deasel* (1974), 19 Ill. App. 3d 353, 355, 311 N.E.2d 414.

The substance of defendant's argument concerns the propriety of the trial judge's actions in consulting with an outside "expert" on an issue central to the case. The problem started, apparently, when there was a suggestion that a third independent expert might be called who would, for the benefit of the judge, clarify the testimony of the two experts offered by the parties to the suit. The report of proceedings for May 12, 1983, indicates that the judge contacted one William Friend and asked him if he would be available as a witness. The judge stated that he discussed with Mr. Friend the issue before the court, namely, the effect of lateral supports on the building. The record indicates that defendant's counsel contacted Friend and then recommended to the judge to not use Friend because Friend was an architect, not a structural engineer. The record further indicates that the judge then contacted Friend again and obtained from him various books relative to the issues involved in this matter. The record further discloses that on March 25, 1983, the trial judge had taken it upon himself to question defendant's expert witness. The judge asked defendant's expert questions relative to lateral support, including whether it's more common to tie bow string trusses, the effect of tying the trusses on the stability of the building, and the effect of the collapse of certain walls on the "slenderness ratio" of the chimney without lateral support. Defendant's counsel did not specifically object to the court questioning his witness; but at the May 12 hearing on the motion for a mistrial, it became clear that defendant's counsel was concerned with the source of the judge's knowledge to ask the questions. The record alludes to a slip of paper held by the judge on which the questions were alleged to have been written. Defendant's counsel believed that the judge's independent study of the matter, based upon information provided by Friend, was the source of the questions. The city argued that the questions were patently based upon previous testimony in the case. After a thorough examination of the reconstructed record in this case, we believe that the actions of the trial judge, however pure his motives, were improper to the extent that defendant must be given a new trial on this matter.

■ In a bench trial, it is presumed that the trial judge has considered only competent evidence; the presumption can be overcome where there is an affirmative showing in the record to the contrary.

(*Drovers National Bank v. Great Southwest Fire Insurance Co.* (1977), 55 Ill. App. 3d 953, 957, 371 N.E.2d 855.) As stated by our supreme court in *People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493:

"Regardless of the standards a trial judge should follow in reviewing the sufficiency of the evidence, it is clear that the judge is confined to the record before him and his impression of the witnesses. Due process does not permit him to go outside the record, except for matters of which a court may take judicial notice, or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." 93 Ill. 2d 421, 428-29.

■ While the trial judge here explicitly stated that he did not use any of the outside information he obtained in considering the case or reaching a decision, we believe that his actions are contrary to those established notions of courtroom form and procedure which regulate the manner in which controversies are resolved in our judicial system. (*Johnson v. Johnson* (1975), 34 Ill. App. 3d 356, 363, 340 N.E.2d 68.) The appearance of fairness and impartiality is as essential to our system as achieving fair, impartial, and just resolutions. The fact that the actions of the judge may have been prompted by defendant's counsel in suggesting the need for an independent expert does not obviate the fundamental problem associated with a judge independently obtaining information directly bearing on an issue in the case; information not subject to judicial notice and completely *dehors* the record. We have no possible way of knowing exactly what was said to the judge, what books were recommended to and read by him, and to what extent that information may have affected his decision. (See *Albert v. Albert* (1950), 340 Ill. App. 582, 586, 92 N.E.2d 491.) We are unpersuaded by the judge's statement that he did not consider the information he obtained, bolstered as it is by his alleged disregard for the testimony of both parties' experts. A contrary ruling would suggest that any taint on proceedings resulting from *dehors* the record investigations could be cured by stating, on the record, that any such investigation served only to clarify the proceedings and in no way formed a basis for decision. For the above reasons, we believe there has been an affirmative showing that the trial judge did not consider only competent evidence and that a new trial is warranted.

■ We shall next analyze, in order to aid the new trial on remand, the issue of whether the city can properly demolish a building without first obtaining a court order and/or notifying the owner.

Defendant relies on section 11—31—1 of the Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 11—31—1), section 39—12 of the Chicago Municipal Code (Chicago Municipal Code 1982, ch. 39, sec. 39—12) and various cases in support of his proposition that the city had to notify him prior to its total demolition of his building. We hold that defendant's contention is without merit.

In the legitimate exercise of its police powers, the municipality must observe and give effect to the maxim declaring, "the safety of the people is the supreme law." (*City of Chicago v. Rogers Park Water Co.* (1905), 214 Ill. 212, 223, 73 N.E. 375.) As stated by our supreme court over 100 years ago in *King v. Davenport* (1881), 98 Ill. 305:

> " 'In the exercise of this (police) power, the legislature may not only provide that certain kinds of property *** may be seized and confiscated upon legal process after notice and hearing; but may also, when necessary to insure the public safety, authorize them to be summarily destroyed by the municipal authorities without previous notice to the owner—as in the familiar case of pulling down buildings to prevent the spreading of a conflagration or the impending fall of the buildings themselves, throwing overboard decaying or infected food, or abating other nuisances dangerous to health.' " *King v. Davenport* (1881), 98 Ill. 305, 313-14, quoting *Blair v. Forehand* (1868), 100 Mass. 136.

At the time of the incident in question, there existed a duly promulgated municipal ordinance in Chicago that clearly authorized summary action by the city to relieve the public of an actual and imminent danger posed by a damaged building or structure. (Chicago Municipal Code 1982, ch. 41, sec. 41—9.) This section represents nothing more than a codification of the municipality's authority, as an arm of the State, to protect the public from imminent dangers through the use of its inherent and constitutionally sanctioned police powers.

Defendant maintains, however, that any summary procedure authorized by the Chicago Municipal Code must be read in conjunction with the statutory notice requirements of section 11—31—1 (Ill. Rev. Stat. 1979, ch. 24, par. 11—31—1). The city of Chicago has a similar notice provision in its municipal code. See Chicago Municipal Code 192, ch. 39, sec. 39—12.

■ The city of Chicago, as a home rule unit, has the right to "exercise any power and perform any function pertaining to its government and affairs." (Ill. Const. 1970, art. VII, sec. 6(a).) Our su-

preme court has held that an ordinance enacted by a home rule unit under the grant of power authorized by section 6(a) supersedes a conflicting State statute that was enacted before the effective date of the constitution. (*Prudential Insurance Co. of America v. City of Chicago* (1977), 66 Ill. 2d 437, 440-41, 362 N.E.2d 1021.) Prior to the adoption of the 1970 Constitution, section 11—31—1 did not have the 1971 amendment regarding County Health Departments. When the city enacted section 39—12, it had the effect of superseding section 11—31—1 to the extent they conflict. Since both sections require notice and application for a court order by the city prior to demolition, the remaining pertinent question here is the relation between section 39—12 and the summary procedures authorized by section 41—9.

█ When an imminent danger to the safety of the public is posed by a structurally unsafe building, for whatever reason, the imposition of a notice requirement, a waiting period requirement, and then a requirement of applying to the circuit court for an authorization order, would have the effect of vitiating the essence of the city's inherent authority to protect the health and safety of its citizens. Every moment's delay in the removal of the danger exposes the populace to danger. "Before any judicial inquiry and hearing could be had in the matter, the whole evil sought to be guarded against might be produced." (*King v. Davenport* (1881), 98 Ill. 305, 315.) There can be no doubt that the city's summary demolition procedure, outlined in section 41—9, is a valid and reasonable exercise of its police power through the grant of authority afforded by the 1970 Constitution. When read in conjunction with section 39—12, it can be seen that in the normal situation, the city must comply with all notice requirements provided in that section. However, when a true emergency does arise, the city is authorized to act summarily without notice. The possibility of a suit for damages is a sufficient deterrent against the city to keep it from acting summarily in all cases.

Reversed and remanded.

PERLIN and HARTMAN, JJ., concur.