2020 IL App (1st) 180869-U

SIXTH DIVISION
January 10, 2020

No. 1-18-0869

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* J.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17 JA 658 |
| | ) | |
| Renee S., | ) | |
| | ) | Honorable Andrea Buford, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1     *Held:*   Trial court did not improperly rely on order of protection; mother was not prejudiced by admission of minor's statements about where she wanted to live; mother was not prejudiced by exclusion of testimony in which she denied intentionally burning the minor; mother was not prejudiced by the State's closing argument; findings of abuse and neglect were not against the manifest weight of the evidence; order denying visitation was not an abuse of discretion; affirmed.

¶ 2     Respondent, Renee S. (Renee), appeals an order of the circuit court that found her daughter, J.M.,

was an abused and neglected minor due to an injurious environment, substantial risk of physical

injury, and excessive corporal punishment. Renee contends that: (1) the court improperly took judicial notice and relied on an *ex parte* emergency order of protection; (2) the court improperly admitted irrelevant and prejudicial hearsay statements about where J.M. wanted to live; (3) the court improperly excluded evidence in which Renee denied that she intended to burn J.M.; (4) the State's closing argument prejudiced Renee and deprived her of a fair hearing and due process; (5) the cumulative impact of the above errors precluded a fair hearing; (6) the findings of abuse and neglect were against the manifest weight of the evidence; and (7) the court's order denying visitation was unfounded and deprived her of due process. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On July 7, 2017, the State filed a petition for adjudication of wardship, alleging that J.M. was neglected due to an injurious environment, abused due to a substantial risk of injury, and abused due to excessive corporal punishment. In April 2017, an intact case was opened after J.M., who was nine years old, was observed to have a burn on her wrist. The petition stated that Renee had been diagnosed with schizophrenia and was non-compliant with her medication. After a temporary custody hearing, the court ordered J.M. removed from her home and temporary custody was granted to the Department of Children and Family Services (DCFS) guardianship administrator. The court also entered an order stating that visits between Renee and J.M. "are not to be put in place until clinically appropriate and minor [J.M.] consents." In the meantime, J.M. lived with her maternal grandmother.

¶ 5       The adjudication hearing was held on March 1, 2018. J.M.'s father, who was non-custodial, was not part of the hearing and his whereabouts were unknown. Harriet S. (Harriet), who was J.M.'s maternal grandmother, testified that DCFS brought J.M. to her house in March 2017. After Harriet identified an emergency order of protection that was entered against Renee on April 17,

2017, Renee's defense counsel objected, asserting that the document was a copy of a certified copy instead of a certified copy of a court order. Defense counsel was unsure if "that meets the foundation requirements for the admission of this record." The court overruled the objection. Harriet explained that she had obtained the order of protection because Renee had constantly come to Harriet's house, where Renee threatened her, rang her doorbell, peeked through the windows, and scared J.M. One night around 11 p.m., when J.M. was in bed, J.M. alerted Harriet that someone was in the window. Upon inspection, Harriet saw Renee's face pressed against J.M.'s bedroom window. On cross-examination, Harriet acknowledged that Renee was not present when the order of protection was initially granted and that the court refused to extend the order of protection after a full hearing.

¶ 6    Sharon Richardson, a DCFS child protection investigator, testified that she was a priority one investigator who investigated allegations of serious harm, including burns, and had taken a class about different types of burns. During a March 2017 conversation, Richardson and Renee discussed a burn that J.M. had sustained on her hand at or near her wrist. Renee explained that J.M. had tried to burn Renee with a clothing iron. Renee added that J.M. handed Renee the iron the wrong way and Renee "handed the iron back to [J.M.] the same way that [J.M.] had handed it to her and that's why she got burned." During the conversation with Richardson, Renee spoke very rapidly, "wasn't really making sense," and had disorganized speech patterns. Renee told Richardson that she was not taking any medication, but was taking pills so that she would not talk so much and the pills were just vitamins.

¶ 7    Richardson also spoke privately with J.M. At the time, J.M.'s burn appeared to be healing, was pink and brownish in color, and had started to scab over a little. Richardson estimated that the burn was the size of a dollar coin or silver dollar. J.M. told Richardson that her mother burned her

on purpose, recalling that Renee "said that I gave her the iron the wrong way, and then she burned me." J.M. also stated that she was not afraid of her mother, but did not want to live with her and instead wanted to live with her father or grandmother.

¶ 8       Emeri Shearrill, an intact family specialist with Kaleidoscope, testified that she was assigned intact service duties for J.M. and Renee in April 2017. Shearrill completed an integrated assessment in June 2017, which was admitted into evidence and stated as follows. During the assessment interview, Renee had trouble answering direct questions and would often get off track. Still, Renee reported that after a surgery in 2012, her mental health changed and she started having hallucinations. Renee believed that during her surgery, a chip was placed in her that allowed certain people to read her thoughts. For several months in 2013, Renee sought mental health treatment, which included therapy and psychotropic medication, but stopped after her therapist said she could do so if she was able to find coping mechanisms that best suited her needs. As of the date of the assessment, Renee had attended a psychiatric appointment and participated in a recommended test. However, Renee was not willing to take psychotropic medication.

¶ 9       Turning to Renee's care of J.M., the assessment stated that J.M. had been homeschooled for over a year, but Renee had not been approved by Chicago Public Schools to homeschool J.M. and was not following a curriculum. J.M. disclosed that if she answered incorrectly during homeschooling, Renee would hit her with a belt. Renee stated that she would make J.M. jump as a form of discipline. Renee had prior DCFS involvement from March 2014, when it was reported that Renee hit J.M. with her hand and a belt, which left a bruise under J.M.'s left eye. J.M. had limited contact with other people while in Renee's care. Renee consistently denied burning J.M. and believed that due to the chip inside her, the military and other family members had plotted to

take her child away. When Renee was informed that J.M. reported that Renee purposely burned her, Renee was shocked and "started saying that [J.M.] may have set this up to happen."

¶ 10    Returning to Shearrill's testimony at the hearing, Shearrill stated that Renee did not want to take psychotropic medication because she did not like its effects. Renee did not successfully complete her intact services by July 2017. Renee had completed an initial mental health assessment, but did not follow the psychiatrist's recommendations. Shearrill recalled that when she asked J.M. in July 2017 if she wanted to return home, J.M. replied that she did not, explaining that her mother would leave her in her room for hours and she was unable to eat.

¶ 11    On cross-examination, Shearrill admitted that during a conversation in April 2017, J.M. had stated that she wanted to return to her mother. The following exchange also took place during defense counsel's cross-examination:

> "Q. And [Renee] denied intentionally burning her child at all times; correct?"
>
> A.  Yes.
>
> MR. CASTANEDA [(ASSISTANT STATE'S ATTORNEY)]: Objection. That's hearsay. That's not an admission, but it is self-serving hearsay.
>
> THE COURT: Any response?
>
> MR. NOVOSEL [(DEFENSE COUNSEL)]: No response.
>
> THE COURT: Sustained."

¶ 12    Renee's medical records from Mercy Hospital were admitted into evidence. At various points in 2014, Renee presented at the hospital as somewhat paranoid with limited insight. She expressed paranoid thoughts about people in her building and at J.M.'s school. In April 2014, Renee reported "popping [J.M.] in the mouth" or spanking her for punishment. Renee also stated that she hit J.M. with a belt. A June 2015 note indicated that Renee presented with schizophrenia, but she disputed the diagnosis.

¶ 13    Records dated March 29, 2017, from the University of Chicago Hospital were also admitted into evidence. On that date, Renee came to the emergency department for a psychiatric evaluation in the context of a recent burn to her daughter and the need for clearance by DCFS. According to the records, Renee reported no mood changes, sleep disturbance, appetite changes, feelings of guilt, racing thoughts, or manic behaviors. Renee also denied any hallucinations or hearing voices and stated she was not on medication. Renee reported that she experienced hallucinations and paranoia in 2013 after a surgery, but those symptoms resolved after a year and she discontinued her psychotropic medication. The records stated that Renee did not show signs of active psychiatric issues and she did "not meet criteria for psychiatric diagnosis at this time."

¶ 14    In its closing argument, the State requested findings of neglect due to an injurious environment, abuse due to a substantial risk of injury, and abuse due to excessive corporal punishment, and further asserted as follows. Renee had an established mental health need and was not compliant with medication, which impacted her judgment and ability to parent. J.M.'s burn, "which you heard Ms. Richardson testify, was not a simple burn, *** must have caused great pain." At the very least, the burn indicated Renee's lack of judgment, and a hot iron should not have been touching a child J.M.'s age. J.M. also stated that Renee burned her deliberately, which was corroborated by the fact that Renee "did not dispute that there was an issue with the iron" and that "essentially, it was the child's fault." Further, "that is corroboration of essentially a consciousness of guilt." There were two prior DCFS indicated reports and DCFS's attempt to ameliorate the risk through intact services was unsuccessful. Moreover, "[w]e have real negative feelings from this eight, nine-year-old child regarding the situation at home. That's never a good thing."

¶ 15    The public guardian and guardian *ad litem* for J.M. adopted the State's argument and added that according to the Mercy Hospital records, Renee had a very long history of mental health issues and noncompliance with treatment. Also, J.M. had suffered two different injuries—the black eye and the burn, which J.M. maintained was intentional.

¶ 16    Renee's defense counsel asserted that the home environment was safe and further stated as follows. Although J.M. believed the burn was intentional, intent was subjective, and whatever happened with the iron was an accident, as Renee had maintained. Further, the court should not give any weight to the order of protection because it had been granted on an emergency basis, when Renee was not able to defend herself, and was later dismissed after a full hearing. Defense counsel also noted that during a conversation with Shearrill, J.M. had stated she wanted to return home.

¶ 17    In rebuttal, the State maintained that it was not simply the order of protection that should be considered, but rather, it was the fact that Renee's mother found it necessary to seek the order of protection due to Renee's odd behavior, which indicated a lack of parental judgment. The State asked to give weight to Harriet's motivation for seeking the order of protection.

¶ 18    In an oral ruling, the court found that the State met its burden and J.M. was neglected due to an injurious environment, abused due to a substantial risk of injury, and abused due to excessive corporal punishment. The court noted that Renee had a history of mental health issues and noncompliance with treatment. In March 2014, Renee admitted to hitting J.M. in the eye. In March 2017, Renee stated that J.M. tried to burn her "by the way she handed her the iron, and then she, the mother, handed it back to her daughter in the same way, resulting in injury to the minor." Further, J.M. reported that she was placed in a room for long periods of time and not allowed to eat. The court also stated that in April 2017, Renee's mother, Harriet, had to obtain an order of

protection when Renee kept harassing Harriet and J.M. The court's written order was an abbreviated version of its oral ruling.

¶ 19    Before turning to scheduling the next court date, defense counsel raised the matter of Renee's visitation. Defense counsel requested that J.M.'s caseworker, Rolanda Bailey-Clark, explain in court what services Renee needed to complete so that visits could resume. In turn, Bailey-Clark stated that Renee had completed parenting classes, but possibly still needed individual counseling. Also, releases were needed to make sure that Renee was taking medication or seeing a psychiatrist. Renee had tendered a psychological evaluation, but had blocked out a lot of the information. Bailey-Clark also stated that J.M. did not want to talk to Renee and told her therapist that she was not ready to see Renee. The court informed Renee that she had to sign a release and complete the services that were asked of her. The court further stated that it would not force J.M. to see her mother and encouraged Renee to write J.M. a letter.

¶ 20    At the dispositional hearing that took place on March 26, 2018, Bailey-Clark testified that J.M. was living with her grandmother and attending school. A no-contact order was in place because J.M. was scared of Renee. Despite that order, Renee had gone to J.M.'s school and taken pictures. J.M.'s school created a safety plan for her and changed drop-off and dismissal procedures, as well as instituted a supervision plan for when J.M. was outside for activities or recess. Bailey-Clark also stated that J.M. was in counseling, where she was making "tremendous progress," but was afraid of Renee. Access was still needed to a psychological evaluation so that Renee's service plan could be finished "as far as services [that are] needed to even get visitation back." Renee had tried to offer bits and pieces of the evaluation, but Bailey-Clark explained to her that the entire document was needed to make sure Renee received all recommended services, and in turn could visit with J.M. and J.M. could later return home. Recently, Renee brought gifts for J.M. and per

Renee's request, pictures of J.M. with the gifts were sent to her. J.M. had also written Renee a letter, but Renee did not believe the letter was actually from J.M.

¶ 21    A letter from J.M.'s therapist that was dated March 12, 2018, was admitted into evidence and stated as follows. J.M. had made significant improvement since she began receiving services in March 2017. Yet, J.M. had made several comments about not wanting to see her mother. J.M. expressed concern about Renee coming to her school, stating, ' "I was afraid she was going to come get me.' " The therapist and J.M. had discussed whether J.M. was ready to have visits with Renee, and each time, J.M. stated she was not ready. J.M. did not want to see her mother because "she does not want her mother to take her." Even when the option of supervised visits was raised, J.M. maintained that she did not want to visit with her mother. The therapist opined that J.M. should only begin visiting with her mother when she felt comfortable and ready to do so.

¶ 22    Renee testified at the hearing that she wanted visits with J.M. and the parenting class she completed was helpful. Renee also discussed her efforts to provide a copy of her psychological evaluation. She stated that the document contained some false statements and information. Renee admitted she had not signed a release for the caseworker to obtain the full records.

¶ 23    After closing arguments, the court adjudged J.M. to be a ward of the court. The court found that appropriate services aimed at family preservation and reunification had been unsuccessful and it was in J.M.'s best interest to appoint the DCFS Guardianship Administrator as her guardian. The court cautioned Renee that she needed to sign the release for her records or she would risk having her parental rights terminated. The court added, "You're not even seeing your daughter right now. Please stay away from her school. *** And stay away from her until such time as is deemed safe." The court also requested that Renee receive information about J.M., including how she was doing in school.

¶ 24    Defense counsel requested that the visitation order be amended to allow for visits. The court denied visitation "until she signs that release and we can get her records, and we can see if she needs additional services." According to the testimony presented, J.M. was "scared right now." The written disposition order did not mention visits.

¶ 25                                      II. ANALYSIS

¶ 26    We first address the timeliness of our decision. This case is designated as "accelerated" under Illinois Supreme Court Rule 311(a) (eff. July 1, 2017), which ordinarily requires this court to issue a decision within 150 days after the filing of the notice of appeal, "[e]xcept for good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2017). Renee filed her notice of appeal on April 24, 2018, so the 150-day period to issue our decision expired on September 21, 2018. However, there was good cause for not meeting that deadline. We granted five motions that Renee's counsel filed for extensions of time to file her brief. When Renee's counsel had not filed her brief by July 16, 2019, which was over a year from the brief's original due date, we dismissed the appeal for want of prosecution. On July 26, 2019, Renee's counsel filed a motion to vacate the dismissal for want of prosecution, which we granted on August 20, 2019. On that same day, Renee's counsel filed her opening brief. Subsequently, the minor's counsel filed a motion to extend the time to file her brief, and the State filed two motions to extend the time to file its brief. Renee's reply brief was due on November 12, 2019, but she did not file one. Because this case was not ready for our review until November 2019, we find good cause to issue our decision after the 150-day deadline in Rule 311(a)(5). See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 27    Turning to the arguments raised on appeal, Renee first contends that the trial court improperly took judicial notice of and relied on the entry of the *ex parte* emergency order of protection that Harriet obtained against Renee. Renee argues that the trial court specifically

referred to the order of protection in its oral and written findings. Renee notes that under the Juvenile Court Act of 1987, a requirement for taking judicial notice of prior court proceedings is that the parties must have been represented by counsel or knowingly waived counsel at the prior proceeding, which did not occur here. Further, when Renee did appear in court, a plenary order of protection was denied.

¶ 28    As background, the Juvenile Court Act of 1987 (Act) provides a process by which a child may be removed from her parents and made a ward of the court. 705 ILCS 405/1-1 *et seq*. (West 2016). When a minor is taken into temporary protective custody, the State files a petition that alleges that the minor is abused, neglected, or dependent and that it is in the best interests of the minor and the public that the minor be adjudged a ward of the court. 705 ILCS 405/2-13 (West 2016). After a temporary custody hearing, an adjudicatory hearing is held to determine whether a preponderance of evidence demonstrates that the minor is abused, neglected, or dependent. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 71 (citing 705 ILCS 405/1-3(1), 2-21(1) (West 2016)). If there is a finding of abuse, neglect, or dependency, the trial court conducts a dispositional hearing to determine whether it is in the minor's best interest to be made a ward of the court. *Id*. The standard civil rules of evidence apply at the adjudicatory hearing. 705 ILCS 405/2-18(1) (West 2016).

¶ 29    The trial court did not improperly rely on the order of protection. In its rebuttal closing argument, the State urged the court not to consider the order of protection itself, but the fact that Harriet found it necessary to seek the order of protection due to Renee's behavior, which indicated a lack of parental judgment. The court appears to have followed the State's guidance. The court's oral ruling states that Harriet obtained the order of protection after Renee kept harassing Harriet and J.M. By its language, the court appears to have considered the circumstances that led to the

order of protection and not the order of protection itself. Further, we presume in a bench trial that the court considered only competent evidence. *People v. Johnson*, 327 Ill. App. 3d 203, 210 (2001). That presumption "can be overcome when there is an affirmative showing in the record to the contrary." *City of Chicago v. Garrett*, 136 Ill. App. 3d 529, 533 (1985). Nothing in the court's ruling indicates that the court relied on improper evidence here. No error occurred.

¶ 30    Next, Renee contends that the trial court improperly admitted irrelevant and prejudicial hearsay statements about where J.M. wanted to live for the purpose of determining whether J.M. was abused or neglected. Further, the State's closing argument urged the court to rely on J.M.'s negative feelings about returning home. Renee argues that J.M.'s statements were not relevant to the question of whether she was abused or neglected and were inadmissible.

¶ 31    J.M.'s living preferences came up twice during the hearing. Richardson testified that J.M. stated that she did not want to live with her mother and instead wanted to live with her father or grandmother. Shearrill also testified that J.M. did not want to return home. We note that on cross-examination, Shearrill admitted that during an earlier conversation, J.M. stated she wanted to return to her mother.

¶ 32    Recognizing that her counsel did not object to J.M.'s statements, Renee requests that we review for plain error or find that her counsel was ineffective. The plain error doctrine applies in child protection cases (*Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 47) and allows a reviewing court to consider unpreserved error when a clear and obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the respondent, or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process (*People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Notably, without reversible error, there is no plain error. *People v. Naylor*, 229 Ill. 2d 584, 602 (2008). As

for Renee's other effort to overcome forfeiture, the well-known *Strickland* standard governs ineffective assistance claims in juvenile proceedings: the respondent must demonstrate that counsel's performance was deficient, and that this deficiency was prejudicial. *In re J.B.*, 2018 IL App (1st) 173096, ¶ 43 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The respondent must prove that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). If there is no prejudice, then we do not need to decide whether counsel's performance was deficient. *Id*. at 94.

¶ 33    As noted above, the purpose of an adjudicatory hearing is to determine whether a preponderance of the evidence shows that a minor is abused, neglected, or dependent. *Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 41. Evidence is relevant if it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable that it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991). J.M.'s statements that she did not want to return home could have some relevance to whether she was abused and neglected by her mother. According to J.M.'s counsel, the statements could indicate that Renee's treatment of J.M. negatively impacted J.M.'s mental and emotional state.

¶ 34    Still, the statements would also have to be admissible. Hearsay—an out-of-court statement offered to prove the truth of the matter asserted—is not admissible unless an exception applies (Ill. R. Evid. 801, 802 (eff. Oct. 15, 2015, and Jan. 1, 2011)). Under the Act, a minor's previous statements "relating to any allegations of abuse or neglect" are admissible. 705 ILCS 405/2-18(4)(c) (West 2016). However, "no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id*.

¶ 35 Ultimately, we do not need to decide whether J.M.'s statements fit the above hearsay exception in the Act because even if the statements were inadmissible, the statements did not affect the trial court's findings of abuse and neglect. Again, in a bench trial, we presume that the trial court only relied on competent evidence to reach its decision. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 37. That presumption "can be overcome when there is an affirmative showing in the record to the contrary." *Garrett*, 136 Ill. App. 3d at 533. Because the trial court's oral and written rulings did not mention J.M.'s feelings about returning home, we presume the trial court did not rely on them. As a result, the statements did not prejudice Renee and there is no plain error. See *In re M.S.*, 2018 IL App (1st) 172659, ¶ 27 ("for plain error to apply, the error must be prejudicial"). And, without prejudice, Renee cannot show that her counsel was ineffective.

¶ 36 Next, Renee contends that the trial court improperly prevented her from rebutting the contention that she intentionally burned J.M. with an iron. Renee notes that the State elicited testimony from Richardson that according to a conversation with Renee, J.M. was burned when an iron was handed the wrong way between mother and daughter. During Shearrill's testimony, Renee's counsel tried to elicit a statement that Renee had denied intentionally burning J.M., but the court sustained an objection to that statement. Renee asserts that the trial court thus prevented her from presenting a defense—that she did not intend to burn J.M.—after the State placed her intent, motive, and consciousness of guilt at issue. Renee further asserts that the State argued in closing that the burn was deliberately inflicted and the court relied on Richardson's testimony about the iron.

¶ 37 The precluded testimony came up during defense counsel's cross-examination of Shearrill, the intact family specialist:

"Q. And Ms. Smith denied intentionally burning her child at all times; correct?

A. Yes.

MR. CASTANEDA [(ASSISTANT STATE'S ATTORNEY)]: Objection that's hearsay. That's not an admission, but it is self-serving hearsay.

THE COURT: Any response?

MR. NOVOSEL [(DEFENSE COUNSEL)]: No response.

THE COURT: Sustained."

¶ 38    In arguing that Shearrill's testimony should have been admitted, Renee relies on the rule in criminal proceedings that when the intent or motive of the accused is material to the issue of guilt, the accused has a right to testify directly to that fact. *People v. Miller*, 327 Ill. App. 3d 594, 598 (2002). The improper exclusion of state-of-mind testimony by an accused that is essential to the defense is reversible error unless other sufficient evidence is admitted at trial. *People v. Upton*, 230 Ill. App. 3d 365, 371 (1992). We review the admission of evidence at an adjudicatory hearing for an abuse of discretion. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 22.

¶ 39    There was no reversible error here. Even if Shearrill's testimony should have been admitted, other evidence presented at the hearing contained Renee's denial that she burned J.M. on purpose. The integrated assessment stated that "Renee reports that [J.M.] mishandled the iron and burned herself" and "Renee consistently denied burning her child." The assessment also included a fuller explanation from Renee:

> "Renee denies burning her child. She believes that due to her having a chip in her, the military and other family members have plotted against her in an attempt to take her child away. When this worker informed Renee that [J.M.] disclosed that she purposely burned her, Renee was shocked and started saying that [J.M.] may have set this up to happen."

Overall, Renee was not prejudiced by the exclusion of Shearrill's testimony where there was ample other evidence of her state-of-mind about the burn, and so there was no reversible error. See *Matter of Wellington*, 34 Ill. App. 3d 515, 519 (1975) (error not reversible without a showing of prejudice).

¶ 40    Renee also contends that after successfully excluding the favorable evidence, the State incorrectly argued in closing that Renee "did not dispute" intentionally burning J.M. The part of the State's closing that Renee refers to is when the prosecutor stated that Renee "did not dispute that there was an issue with the iron." To the extent that the prosecutor misstated the evidence by suggesting that Renee agreed that the burn was intentional, that misstatement did not appear to affect the court's ruling. Again, we presume that in a bench trial, the court relied only on proper evidence and argument. *People v. Pelegri*, 39 Ill. 2d 568, 575 (1968). Competing versions of the burn incident were presented. Although the court did not explicitly recite Renee's denials from the integrated assessment, that evidence was before the court. And, we presume that the trial court considered all the evidence. *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 105. The trial court appears to have credited the version of the iron incident that was told to Richardson, rather than Renee's denials in the integrated assessment. This result was entirely consistent with the trial court's role to determine the weight and credibility of testimony and resolve conflicts in the testimony. See *In re A.P.*, 179 Ill. 2d 184, 205 (1997) (circuit court is in the best position to determine the weight and credibility of witnesses' testimony and resolve conflicts in the testimony). There is no showing that the court operated under a false understanding that Renee conceded that the burn was intentional. The exclusion of Shearrill's testimony, and the State's subsequent misstatement, was not reversible error.

¶ 41    Renee next contends that the State made two improper comments in its closing argument that substantially prejudiced her and denied her a fair trial. First, the prosecutor improperly and deliberately relied on facts not in evidence when he argued that J.M. had suffered an unusually large and painful burn. Second, the prosecutor improperly argued that Renee exhibited a

consciousness of guilt even though there was no evidence that Renee's explanation for the burn was a false exculpatory statement.

¶ 42    Turning to the comments about the extent of J.M.'s burn, Renee argues that whether a burn was inflicted intentionally or accidentally is a matter of expert opinion, and Richardson, who testified about the nature of the burn, was not qualified as an expert. Renee contends that without the improper comments, the court may have found that a lack of medical evidence precluded a finding that the burn was intentional.

¶ 43    Prosecutors are given wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). However, a prosecutor may not argue assumptions or facts that are not based on the evidence in the case or present what amounts to his own testimony. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). Allegedly improper comments must be considered in the context of the entire closing statements of the parties. *Williams*, 192 Ill. 2d at 573. Even if a comment is improper, we will not reverse unless the comment caused substantial prejudice. *Id*. We review for an abuse of discretion whether a prosecutor's comments were improper and review *de novo* the legal issue of whether the improper comments were so egregious that they warrant a new trial. *People v. Davis*, 2018 IL App (1st) 152413, ¶ 68. Recognizing that her counsel did not object to the prosecutor's comments, Renee urges this court to review the issue for plain error or find that her counsel was ineffective for not objecting.

¶ 44    The comment at issue was included in the following section of the prosecutor's closing argument:

"This is a situation with a young child and mother with an established mental health need, medication regimen, which is required, but

not compliant with medication, and that's a chronic issue. It directly impacts this mother's ability to parent, her judgment. For example, with the burn, which you heard Ms. Richardson testify, was not a simple burn. It must have caused great pain, but this is a situation where judgment clearly was at issue. A hot iron should not be touching this eight-year-old. And if your Honor looks at the situation, it's clearly an issue of a lack of judgment, at the very least."

Richardson had testified that the burn on J.M.'s hand was pink and brownish and had started to scab over a little. Also, Richardson estimated that the burn was the size of a dollar coin or silver dollar. In context, the prosecutor's description of the burn was not improper. The prosecutor did not suggest that the extent of the burn meant the burn was intentional. Rather, the prosecutor asserted that Renee's lack of judgment led to an injury. It was no great leap to assert that being burned with a hot iron, which left a mark the size of a dollar coin or silver dollar, would have been very painful.

¶ 45    Further, Renee has not shown that that burn comments affected the outcome of the hearing. See *People v. McGee*, 268 Ill. App. 3d 582, 586 (1994) (party seeking reversal has burden of showing that the improper evidence influenced the court). Again, we presume that the court in a bench trial relied only on proper evidence and argument. *Pelegri*, 39 Ill. 2d at 575. The trial court's ruling does not mention the relative severity of J.M.'s burn. Nothing in the court's ruling suggests that the court was swayed by the State's description of the burn. Renee was not prejudiced by her counsel's failure to object and any error did not rise to the level of plain error. See *Naylor*, 229 Ill. 2d at 602 (without reversible error, there is no plain error); *J.B.*, 2018 IL App (1st) 173096, ¶ 43

(for ineffective assistance claim, respondent must show counsel's performance prejudiced the defense, which requires a reasonable probability of a different outcome).

¶ 46    The second allegedly improper remark in the State's closing argument relates to the phrase "consciousness of guilt," and is contained in the following passage:

> "But there's more because the minor does say that the mother did it deliberately. That's corroborated by the fact that the mother did not dispute that there was an issue with the iron and that *** essentially, it was the child's fault. And in that situation, that is corroboration of essentially a consciousness of guilt. The child should have never been near the iron with this particular injury, and that is an actual injury that was caused."

¶ 47    According to Renee, the prosecutor argued above that Renee exhibited a consciousness of guilt by making a false exculpatory statement that the burn happened because J.M. touched the iron the wrong way. The principle at issue here is that a criminal defendant's false exculpatory statement has independent probative value as evidence of consciousness of guilt and is admissible. *People v. Watson*, 103 Ill. App. 3d 992, 995 (1982). Renee contends that Renee's version of the burn incident was neither inherently false nor indicative of abuse or neglect.

¶ 48    We cannot divine what the prosecutor meant by "corroboration of essentially a consciousness of guilt." We agree that Renee's statement that J.M. touched the iron incorrectly is not inherently false. Still, Renee has not shown that the prosecutor's comment at all influenced the trial court's ruling. See *Garrett*, 136 Ill. App. 3d at 533 (reviewing court presumes trial court considered only competent evidence absent affirmative showing in the record to the contrary). The comment was not prejudicial and so we do not find plain error or that Renee's counsel was ineffective.

¶ 49    Renee also contends that the cumulative impact of the various evidentiary errors denied her a fair hearing. Renee argues that the prejudicial impact of the closing argument was enhanced by the cumulative impact of the other errors, which included admitting evidence of the *ex parte* order of protection, admitting evidence of J.M.'s preference of where she wanted to live, and denying Renee of the ability to effectively cross-examine a witness. Though "[i]ndividual trial errors may have the cumulative effect of denying a defendant a fair trial" (*People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006)), there is generally no cumulative error where the alleged errors do not amount to reversible error on any individual issue (*People v. Green*, 2017 IL App (1st) 152513, ¶ 118). Because none of Renee's claimed errors were actually errors or affected the trial court's ruling, there is no cumulative error.

¶ 50    Next, Renee contends that the trial court's findings of abuse and neglect were against the manifest weight of the evidence. To review, after the hearing, the trial court found that J.M. was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)), abused due to a substantial risk of injury (705 ILCS 405/2-3(2)(ii) (West 2016)), and abused due to excessive corporal punishment (705 ILCS 405/2-3(2)(v) (West 2016)).

¶ 51    We summarize the principles related to each of the three findings. " 'Neglect' is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006). An "injurious environment" is an amorphous concept that cannot be defined with particularity (*In re N.B.*, 191 Ill. 2d 338, 346 (2000)), but the term has been interpreted to include "the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children" ((Internal quotation marks omitted.) (*In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 40)). The focus is whether the minor is neglected, not whether the parent is neglectful. *Id*. ¶ 36. Meanwhile, an abused minor

includes any minor whose parent creates a substantial risk of injury to the minor by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2016). As for the court's third finding, the Act does not define "excessive corporal punishment." *In re J.P.*, 294 Ill. App. 3d 991, 1002 (1998). Factors relevant to deciding whether corporal punishment is excessive include (1) the likelihood of future, more serious injury, (2) the psychological effects on the child, and (3) the circumstances surrounding the discipline. *Id*. at 1003 (citing *In re F.W.*, 261 Ill. App. 3d 894 (1994)).

¶ 52     In all events, cases involving allegations of abuse and neglect are *sui generis* and must be decided on their unique facts. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. The State has the burden to prove the allegations by a preponderance of the evidence (*id.*), which is proof that makes the condition more probable than not (*N.B.*, 191 Ill. 2d at 343). We will not disturb the trial court's findings of abuse and neglect unless they are against the manifest weight of the evidence. *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 31. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id*. The trial court has broad discretion in determining whether there is abuse and neglect and there is a strong and compelling presumption in favor of the result reached by the trial court. *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. Further, "we may affirm the trial court's rulings if any of its bases of abuse or neglect may be upheld." *Id*.

¶ 53     In part, Renee asserts that the trial court did not find the required causal link between her mental illness and J.M.'s care. In neglect proceedings, "it is not enough for the State to show simply that the parent suffers from a mental illness. Rather, the State must also show that the mental illness 'places the children in an injurious environment.' " *In re Faith B.*, 216 Ill. 2d 1, 14 (2005). Here, there was ample evidence connecting Renee's untreated mental illness with J.M.'s

abuse and neglect. According to the integrated assessment, Renee started having mental health issues in 2012 after a surgery. She started hallucinating and believed that a chip was placed inside her that allowed certain people to read her thoughts. She sought treatment in 2013, but stopped participating and taking her medication. Renee's records from Mercy Hospital indicated that her mental health issues continued in 2014 and 2015, and in 2015, she was diagnosed with schizophrenia. During Renee's March 2017 conversation with Richardson, Renee "wasn't really making sense." As of the date of the integrated assessment, Renee still believed that a chip was inside her, and that the military and family members had plotted to take away her child. We acknowledge that records from a visit to the University of Chicago emergency department indicated that Renee did not show signs of a psychiatric issue. However, the trial court was in the best position to resolve conflicts in the testimony *(A.P.*, 179 Ill. 2d at 204) and weigh the evidence (*In re K.T.*, 361 Ill. App. 3d 187, 201 (2005)). The trial court apparently concluded that Renee's mental illness persisted, and we defer to that finding.

¶ 54    Further, Renee's mental health issues negatively affected J.M. Harriet testified that Renee engaged in behavior that scared J.M. As for the iron incident, the trial court apparently credited the version told by Renee to Richardson, where after J.M. tried to burn her, Renee handed J.M. the iron the wrong way. We defer to the trial court's crediting of Richardson's testimony over Renee's denials that she burned J.M. or her statement that the incident was an accident. See *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991) (trial court is in much better position to assess witnesses' credibility and weigh the evidence). Even if Renee did not intend to burn J.M. by handing her the iron, Renee still placed J.M. in danger. And, a specific intent to hurt the child is not needed to find abuse. *K.T.*, 361 Ill. App. 3d 187, 201 (2005). There was also evidence of other injuries that J.M. suffered, including being hit by Renee using a hand and a belt, which left a bruise under J.M.'s eye. Renee

also reported "popping" J.M. "in the mouth" for punishment. The same facts and evidence that support a finding of neglect due to an injurious environment can support a finding of abuse due to a substantial risk of physical injury. *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44. Based on J.M.'s burn, the prior physical acts against J.M., and Renee's non-compliance with treatment for her mental illness, the trial court's findings that J.M. was neglected due to an injurious environment and abused due to a substantial risk of injury were not against the manifest weight of the evidence. See *Faith B.*, 216 Ill. 2d at 15 (finding of neglect due to injurious environment was not against the manifest weight of the evidence based on mother's unaddressed mental health issues and demonstrated willingness to engage in physical acts against her children); *In re Jerome F.*, 325 Ill. App. 3d 812, 820 (2001) (iron burns, along with refusal to address drug addiction and other factors, were sufficient to support finding of abuse due to substantial risk of injury). Based on this result, we do not need to review the trial court's additional finding that J.M. was abused due to excessive corporal punishment. See *Faith B.*, 216 Ill. 2d at 15 (declining to address additional finding of abuse or neglect after finding that sufficient evidence supported finding of neglect based on injurious environment).

¶ 55    Lastly, Renee contends that the trial court's visitation order was unfounded and deprived her of due process. Renee argues that the trial court abused its discretion by barring visits where there was no evidence of psychological trauma or safety concerns related to visits. Further, denying visits was an improper punishment for Renee's failure to sign a release for her records. Renee asserts that by barring visits, the trial court artificially intervened in the bonding process and ensured that Renee will fail a best interests test if the case proceeds to termination.

¶ 56    Initially, the public guardian maintains that we do not have jurisdiction to review the trial court's ruling on visits because that ruling was not part of the adjudication or disposition order.

While we must be certain of our jurisdiction before we address the merits of Renee's arguments about visitation (*In re Brandon S.*, 331 Ill. App. 3d 757, 760 (2002)), we find that we indeed have jurisdiction over the visiting order in this case.

¶ 57    A disposition order from the juvenile court is generally considered final and appealable. *Id*. Section 2-23(3)(iii) of the Act provides that as part of the disposition order, the trial court "shall also enter any other orders necessary to fulfill the service plan," including visiting orders. 705 ILCS 405/2-23(3)(iii) (West 2016). Here, at the dispositional hearing, the prospect of visits came up repeatedly. Bailey-Clark, J.M.'s caseworker, testified that she still needed access to an evaluation Renee had completed so that the service plan could identify the services needed for visits to resume. A letter from J.M.'s therapist was admitted into evidence, which discussed J.M.'s reluctance to resume visits. Renee testified that she wanted visits with J.M. At the end of the hearing, after the court adjudged J.M. a ward of the court and appointed the DCFS guardianship administrator as her guardian, defense counsel requested that the visitation order be amended to allow for visits. The court denied visitation. Although the written disposition order did not mention visits, our reading of the transcript from that date indicates that the court's oral ruling on visits was part of the dispositional hearing. Even if the visitation order was entered separately, we will still address the visitation order in the interest of judicial economy. All of the information needed to consider the matter is found in the record of the dispositional hearing.

¶ 58    We will reverse a dispositional determination only if the trial court's findings of fact are against the manifest weight of the evidence or if the trial court abused its discretion by selecting an inappropriate dispositional order. *In re Taylor B.*, 359 Ill. App. 3d 647, 650 (2005). We also review a dispositional order in light of the purposes and policies of the Act, keeping in mind that

"[t]he overriding purpose of the Act to which all other goals are subordinate is the 'best interest' of the minors involved." *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994).

¶ 59    At the dispositional hearing, Bailey-Clark testified that a no-contact order was in place because J.M. was scared of Renee. Renee had gone to J.M.'s school and taken pictures. According to a letter from J.M.'s therapist, J.M. had made significant improvement, but did not want to see Renee. J.M. was worried that Renee would come to her school and " 'get [her].' " Each time they discussed whether J.M. was ready for visits, J.M. stated she was not ready and that she did not want to see Renee because she did not want her mother "to take her." The therapist stated that visits should resume when J.M. felt comfortable and ready to do so. For her part, Renee stated she wanted visits, but she admitted she had not signed a release for her full records. Bailey-Clark stated that she still needed access to an evaluation so that a service plan could be completed. Based on Renee's ongoing mental health issues, the missing information about what services she needed, and J.M.'s fear of her mother, the court's denial of visits was not an abuse of discretion. The evidence indicated that J.M. was not ready for visits, and in line with the Act's purpose to provide for a minor's best interest, the court properly put visits on hold until any needed services were identified and J.M. felt comfortable seeing Renee. Further, the court did not deny visits to punish Renee for not signing a release. The purpose of the release was to identify what services Renee needed, which was a step to starting visits. The court also allowed for some limited contact between Renee and J.M., encouraging Renee to write a letter to J.M. and requesting that Renee receive information about J.M.'s progress at school. The denial of visits was proper based on the current status of the case.

¶ 60                                                III. CONCLUSION

¶ 61    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 62    Affirmed.